1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LAVON RAMSEY,                          No.  2:14-cv-01908-KJM-CMK

12                  Plaintiff,

13         v.                               ORDER

14   SISKIYOU HOSPITAL, INC. D/B/A
     FAIRCHILD MEDICAL CENTER, and
15   DOES 1 through 10, inclusive,[1]

16                  Defendants.

17

18         Plaintiff Lavon Ramsey filed this action against defendant Siskiyou Hospital, Inc.

19   d/b/a Fairchild Medical Center ("Fairchild" or "Hospital") in August 2014, alleging defendant

20   terminated her employment on the basis of her age in violation of the Age Discrimination in

21   Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the California Fair

22         _____

23         [1] The Ninth Circuit provides, "'[Plaintiffs] should be given an opportunity through
     discovery to identify [] unknown defendants'" "in circumstances . . . 'where the identity of the
24   alleged defendant[] [is] not [] known prior to the filing of a complaint.'" *Wakefield v. Thompson*,
     177 F.3d 1160, 1163 (9th Cir. 1999) (quoting *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir.
25   1980)) (modifications in original).  Federal Rule of Civil Procedure 4(m), as recently amended,
     provides for dismissal of defendants not served within ninety days of filing of the complaint
26   unless the plaintiff shows good cause.  *See Glass v. Fields*, No. 09-00098, 2011 U.S. Dist. LEXIS
     97604 (E.D. Cal. Aug. 31, 2011); *Hard Drive Prods. v. Does*, No. 11-01567, 2011 U.S. Dist.
27   LEXIS 109837, at *2–4 (N.D. Cal. Sept. 27, 2011).  Plaintiff will be ordered to show cause in the
     parties' joint pretrial statement why the court should not dismiss the "Doe" defendants.
28

1

1   Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12900 *et seq.*  This matter is before

2   the court on defendant's motion for summary judgment or, alternatively, partial summary

3   judgment.  ECF No. 21 ("Mem. P. &. A.").  Plaintiff opposes the motion.  ECF No. 31 ("Opp'n").

4   The court held a hearing on the matter on January 29, 2016, at which John Kelley appeared for

5   Ramsey and Andrea Fellion appeared for Fairchild.  As explained below, the court DENIES

6   defendant's motion.

7   I.        EVIDENTIARY OBJECTIONS

8              Plaintiff includes a separate Statement of Disputed Facts in support of her

9   opposition to defendant's motion for summary judgment, in which she lists eighty-three

10   "disputed" facts.  Separate Statement of Disputed Facts (SDF), ECF No. 31-4.  Defendant objects

11   to seventy-one of those facts, and objects to many of the facts on multiple grounds.  ECF No. 36.

12             Many of defendant's objections are merely "boilerplate recitations of evidentiary

13   principles or blanket objections without analysis applied to specific items of evidence," *Stonefire*

14   *Grill, Inc. v. FGF Brands, Inc.*, No. 11-8292, 2013 WL 6662718, at *4 (C.D. Cal. Aug. 16, 2013)

15   (quoting *Doe v. Starbucks, Inc.*, No. 08-0582, 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18,

16   2009)).  Accordingly, the court declines to scrutinize each of defendant's individual objections or

17   fully analyze identical objections raised as to each fact.  *See Mayes v. Kaiser Found. Hosps.*, No.

18   12-1726, 2014 WL 2506195, at *2–3 (E.D. Cal. June 3, 2014); *Stonefire Grill, Inc.*, 2013 WL

19   6662718, at *4; *Capitol Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1200 n.1 (C.D.

20   Cal. 2010) ("In motions for summary judgment with numerous objections, it is often unnecessary

21   and impractical for a court to methodically scrutinize each objection and give a full analysis of

22   each argument raised." (citation omitted)).

23             To the extent defendant objects on the basis of relevance, such objections "are all

24   duplicative of the summary judgment standard itself . . . [The court] cannot rely on irrelevant

25   facts, and thus relevance objections are redundant."  *Burch v. Regents of Univ. of Cal.*, 433 F.

26   Supp. 2d 1110, 1119 (E.D. Cal. 2006).  The court similarly overrules defendant's objections

27   relating to undue prejudice, confusion, or waste of time.

28

2

1    Defendant's numerous hearsay objections also will not be sustained at this stage.

2    *Quanta Indem. Co. v. Amberwood Dev. Inc.*, No. 11–01807, 2014 WL 1246144, at *3 (D. Ariz.

3    Mar. 26, 2014) ("[E]vidence containing hearsay statements is admissible only if offered in

4    opposition to the motion."). On summary judgment, "objections to the *form* in which the

5    evidence is presented are particularly misguided where, as here, they target the non-moving

6    party's evidence." *Burch*, 433 F. Supp. 2d at 1119 (emphasis in original). Moreover, most of the

7    challenged evidence appears to be admissible under Federal Rule of Evidence 801(d)(2)(D),

8    because it consists of statements made by Fairchild's agents or employees during administrative

9    meetings.

10   II.    FACTUAL BACKGROUND

11   The court has determined the following facts are undisputed, unless otherwise

12   noted. To the extent the court relies on the facts described below, associated evidentiary

13   objections are overruled, as discussed in the previous section.

14   A.    Background

15   Ramsey was born on April 28, 1944, and has been a registered nurse since 1967.

16   Ramsey Decl. ¶¶ 1–2, ECF No. 31-2. She began working at Fairchild as a registered nurse in

17   October 2000. Ramsey Dep. 84, Fellion Decl. Ex. 1, ECF No. 25. Fairchild is a twenty-five bed,

18   critical access hospital in Yreka, California. Sarmento Decl. ¶ 2, ECF No. 26. In January 2014,

19   Ramsey's title at Fairchild was Employee Health Nurse, and her job duties included giving all

20   employees an annual tuberculosis (TB) skin test. Ramsey Decl. ¶ 2; Ramsey Dep. 140; Pimintel

21   Decl. ¶ 3, Ex. A, ECF No. 28. To perform a TB skin test, a small bubble of purified protein

22   derivative fluid is injected under the employee's forearm skin. Ramsey Dep. 142. The test is

23   read forty-eight to seventy-two hours later by looking at the injection site. *Id.* at 142–43. If the

24   injection site is hardened or "indurated," the test is positive, which requires further testing, such

25   as a blood test, health questionnaire, or a chest x-ray. *Id.* at 141–44; Pimintel Decl. Ex. A.

26   Fairchild is subject to the Health Information Portability and Accountability Act of

27   1996 ("HIPAA"), Pub. L. 104-191 (codified at 42 U.S.C. § 300gg, 29 U.S.C. § 1181 *et seq.*, and

28   42 U.S.C. § 1320d *et seq.*). Madden Dep. 12–13, Fellion Decl. Ex. 2, ECF No. 25; Madden Decl.

¶ 2, ECF No. 27.  HIPAA generally prohibits certain medical care providers, or "covered entities," from disclosing a patient's protected health information beyond what is necessary to provide care for the individual, including the billing, diagnosis, or treatment.  Madden Decl. ¶¶ 2, 3, Ex. B; Ramsey Dep. 104–05.  Covered entities may be subject to fines and criminal penalties for the HIPAA violations of their employees.  Madden Decl. ¶ 2.  For example, unintentional HIPAA violations may subject Fairchild to a maximum penalty of $50,000 per violation.  *Id.*

Fairchild's Human Resources Manager, Joann Sarmento, provides all Fairchild employees with a copy of Fairchild's employee handbook.  Sarmento Decl. ¶ 3.  Fairchild's 2009 employee handbook included privacy and confidentiality policies, which provide, in part,

> All information concerning patients is to be held in the strictest confidence.  Medical records and information regarding a patient's care may be read, shared, or discussed only within the following guidelines:
>
> - It must be for reasons specific to the treatment plan of the patient;
>
> - It must involve only those individuals delivering or assessing the care of patients; . . . .
>
> The Hospital complies with both Federal and State regulations concerning the privacy of our patient's information . . . . If the employee suspects that they or others have violated our patient's privacy, they need to contact their Supervisor or HIPAA Privacy Officer . . . .

*Id.* ¶ 3, Ex. A at 1–2.  Sarmento also provides Fairchild employees with a copy of Fairchild's Confidentiality Agreement.  *Id.* ¶ 3.  Ramsey signed the 2009 Confidentiality Agreement, which prohibits employees from making use of the Hospital's confidential information "except for the purposes specified by the Hospital or required to perform employee's job for the Hospital."  *Id.* ¶ 3, Ex. B.

Fairchild provided its employees with annual, mandatory, in-person and online training on its privacy and confidentiality policies.  Madden Dep. 20–22.  Mike Madden, Fairchild's HIPAA Privacy Officer since 2000, oversees Fairchild's privacy and confidentiality training and is responsible for investigating possible HIPAA violations.  *Id.* at 28; Madden Decl.

1    ¶¶ 3, 5.  Pursuant to this training, Ramsey signed a written acknowledgment of Fairchild's

2    HIPAA Notice, which provided,

3                    **Acknowledgement -** I understand and agree that in the
                     performance of my duties as an employee in the Nursing
4                    Department, I am expected to treat all information as confidential
                     and that I must ensure the patients' rights to privacy of information.
5
6                    Any inappropriate use and disclosure of [protected health
                     information] will be immediately investigated by the Hospital's
7                    HIPAA Privacy Officers.  I further understand that any violation of
                     HIPAA may result in disciplinary action including termination of
8                    employment . . . .

9    Madden Decl. ¶¶ 3, 6, Ex. B.

10           In January 2014, Ramsey received her annual evaluation.  Her overall score was in

11   the "commendable range," the second highest category.  Howell Dep. 30–32, Kelley Decl. Ex. 9,

12   ECF No. 31-1.  Under management comments, her evaluation stated, "Lavon continues to

13   perform the Employee Health Nurse role extremely well and has been able to complete employee

14   test requirements in a timely manner."  *Id.* at 32.  In the categories related to patient privacy rights

15   and HIPAA compliance, Ramsey received scores in the highest category.  *Id.* at 15–19.

16           B.      Ramsey's Alleged HIPAA Violation

17           On January 21, 2014, Ramsey gave Fairchild employee Doe[2] his annual TB skin

18   test.  Ramsey Dep. 150, 171.  After about fifteen minutes, Doe returned to Ramsey and told her

19   he was afraid he had TB.  *Id.* at 171.  Ramsey explained to Doe he was likely having a hyper-

20   allergic reaction to his TB test and instructed him to go to the emergency room to be evaluated.

21   *Id.*  Forty-eight hours later, on January 23, Ramsey read Doe's skin test and determined it was

22   negative, because his skin was not indurated.  *Id.* at 150.

23           Before Ramsey had read the results, however, Doe went to his private physician,

24   Dr. Steven Kolpacoff, and asked him to order a blood test known as a QuantiFERON gold test or

25   _____

26           [2] As the parties jointly requested, ECF No. 20, and as provided by Local Rule 140, the
     court authorized the parties to refer to this patient as "John Doe" or "Doe" in briefing and to
27   redact this patient's name from documents publicly filed with the court.  ECF No. 30.  The court
     likewise refers to this patient as "Doe."
28

"Q-Gold test," to see if he had TB or if he was having an allergic reaction. *Id.* at 171–75. Dr. Kolpacoff ordered the test on January 23, before Ramsey read Doe's TB skin test results. *Id.* at 163. A copy of Doe's Q-Gold test results was delivered to Ramsey's office in late January 2014 and showed he tested "high" positive for TB. Ramsey Decl. ¶ 3; Ramsey Dep. 175–76. Because the Q-Gold test was fairly new at the time, Ramsey conducted research to understand the positive result and the allergic reaction. Ramsey Decl. ¶ 3; Ramsey Dep. 176. Although Ramsey believed the test was inaccurate due to Doe's allergic reaction, she reported the positive reaction to the Public Health Department, as she was required to do with any suspicious TB situation. Ramsey Decl. ¶ 3; Ramsey Dep. 176. When she spoke with representatives at the Public Health Department, she discussed her research with them and asked for advice on how long to wait before recommending Doe take another Q-Gold test. Ramsey Dep. 176. Ramsey then talked to Doe about the January test results and the new information she obtained through her research. Ramsey Decl. ¶ 3.

On March 18, 2014, Doe obtained a second Q-Gold test from his private physician. *Id.* ¶ 4. Doe's March Q-Gold test was also positive for TB, but the value had decreased from the January test. *Id.* A hard copy of his second lab results was delivered to Ramsey's office on Friday, March 21. *See* Madden Dep. 33, 74; Madden Decl. ¶ 5, Ex. E at 1. Elizabeth Pimintel, the Infection Control Nurse, initially received the results because she shared her office and mailbox with Ramsey. Ramsey Dep. 163–66; Ramsey Decl. ¶ 4. On Monday, March 24, Pimintel handed the results to Ramsey and asked her to handle it. Ramsey Dep. 165. Ramsey opened Doe's electronic file on her computer to refresh her memory on his first test results. *Id.* at 183–84.

That same day, on March 24, Ramsey spoke with the head of Fairchild's lab, Jane Vanover. Ramsey Decl. ¶ 4. She asked Vanover if Vanover had seen Doe's test results and told Vanover she thought it was an allergic reaction. Vanover Decl. ¶ 3, ECF No. 29. According to Ramsey, she spoke with Vanover to get a better understanding of the test results, which was a common practice followed by Hospital Infection Control Nurses and Employee Health Nurses. Ramsey Decl. ¶ 4. Ramsey also called the TB Hotline, and spoke with Dr. Chris Smithers, in

conducting research on "the correct thing to do in a situation like that for [her] own learning."
Ramsey Dep. 178–79.  Dr. Smithers told her she needed to communicate certain information to
the physician who ordered the tests, because the physician probably was not aware that the test
should not have been run so close in time to the allergic reaction.  *Id.* at 178.  Dr. Smithers
delineated the next steps she should take and provided treatment options for Doe.  *Id.* at 178–82.

   The next day, Tuesday, March 25, Ramsey spoke again with Doe about his test
results.  *Id.* at 177–81.  In her declaration, Ramsey states she viewed this follow-up as part of her
job duties at Fairchild.  Ramsey Decl. ¶ 4.  Ramsey then spoke with Doe's private doctor, Dr.
Kolpacoff, about the results and what she had learned from the TB Hotline.  Ramsey Dep. 177–
81.  At some point, Ramsey also reported Doe's second test results to the County Health
Department.  Ramsey Decl. ¶ 4.

   C.  Fairchild's Investigation and Termination of Ramsey

   In the meantime, after Ramsey discussed the lab results with Vanover on Monday,
March 24, Vanover had reported the conversation to Fairchild's HIPAA Privacy Officer, Madden,
as a potential HIPAA violation.  Madden Dep. 25–27; Vanover Decl. ¶ 4; Madden Decl. ¶ 5, Ex.
E at 1.  In a declaration, Vanover states she was uncomfortable with her conversation with
Ramsey, because she was not involved in Doe's medical care, and also felt Ramsey did not need
to know Doe's test results.  Vanover Decl. ¶¶ 3–4.

   In response to Vanover's report, Madden immediately launched an investigation.
Madden Dep. 25–26; Madden Decl. ¶ 5, Ex. E at 1.  Madden first interviewed Jodi Gretzke,
Fairchild's Business Office Manager, to determine who had ordered the Q-Gold tests.  Madden
Dep. 31.  Madden reviewed documents provided by Gretzke and found that Dr. Kolpacoff had
ordered both Q-Gold tests.  *Id.* at 31–32.  Madden also determined that the tests had been billed to
Doe's private medical insurance, and not to the Employee Health Department, as they would have
been had Fairchild ordered the tests.  *Id.* at 32; Madden Decl. ¶ 5.  Madden spoke with Vanover
to ask when the test results were received.  Madden Dep. 33; Madden Decl. ¶ 5, Ex. E at 1.
Madden then interviewed Doe to determine whether he had purposefully shared the results with
Ramsey.  Madden Dep. 34–35.  According to Madden, Doe reported he had not shared the results

1   with Ramsey and had not yet received the results from his provider.  Madden Dep. 33–36;

2   Madden Decl. ¶ 5.  Madden then went to Joan Munson, Fairchild's HIPAA Security Officer and

3   information systems manager, to review Ramsey's computer access to Fairchild's laboratory

4   information system.  Madden Dep. 38; Madden Decl. Ex. E at 1.  Munson reported that Ramsey

5   had accessed her computer and viewed electronic copies of both of Doe's Q-Gold test results at

6   approximately 8:00 a.m. that morning.  Madden Dep. 38–40.

7            Madden prepared summaries of his investigation and his findings.  Madden Decl.

8   ¶¶ 5–6, Exs. E & F.  Madden did not report Ramsey's HIPAA violation to the California

9   Department of Public Health, because Doe's information was contained within the Hospital and

10  had a low probability of being compromised.  Madden Decl. II ¶ 6.

11           The next day, Tuesday, March 25, Madden met with Kathy Shelvock, Fairchild's

12  head nurse and co-Assistant Administrator, and John Andrus, Fairchild's Chief Executive Officer,

13  to discuss Ramsey's conduct.  Madden Dep. 56–57; Madden Decl. ¶ 6.  They went over

14  Madden's findings from the investigation, decided the evidence showed Ramsey had accessed

15  and disseminated Doe's test results without his authorization in violation of Fairchild's policies,

16  and concluded termination was therefore warranted.  Madden Dep. 56–59, 92; Madden Decl. ¶ 6,

17  Ex. F at 1.

18           On Wednesday, March 26, Madden and Shelvock met with Ramsey to discuss the

19  matter.  Ramsey Dep. 156.  Madden told her they had evidence she committed a HIPAA

20  violation, and she said, "No.  Someone gave me that hard copy result."  *Id.* at 187.  Madden then

21  said, "Well, we have evidence that you viewed it online."  *Id.*  Prior to the meeting, Madden had

22  not learned that a paper copy of the lab results was sent to Ramsey's office, and he did not at any

23  point investigate why the paper results were sent to Ramsey's office or why there was cursive

24  writing on the paper results routing them to Infection Control.  Madden Dep. 46, 51–55.  Ramsey

25  testified at her deposition that she was not allowed to give her side of the story at the meeting, and

26  was only able to interject that she did not know why she was there, and that it was a HIPAA

27  violation for Vanover to have told them the details.  Ramsey Dep. at 187.  During the meeting,

28

Madden and Shelvock terminated Ramsey's employment with Fairchild. *Id.* at 158, 163. At the time she was terminated, Ramsey was sixty-nine years and eleven months old. Ramsey Decl. ¶ 1.

Approximately three months after Ramsey's termination, Fairchild replaced her with Peggy Amaral, Ramsey's former manager who had twenty-four years of experience at Fairchild. Sarmento Decl. ¶ 9. Amaral was fifty-six years old at the time of the transition. *Id.* At the time of Ramsey's termination, Fairchild employed 433 employees, sixty-seven of whom were age sixty or older (15%), with 200 age fifty or older (46%), and 288 age forty or older (67%). *Id.* ¶ 10.

D.     Pendergrass and Scott Testimony

Laura Pendergrass worked as an administrator for Fairchild from November 2009 to May 2013. Pendergrass Dep. 6. In her role, Pendergrass attended administrative leadership team meetings, where the team examined the Hospital's spending. *Id.* at 19–20. The weekly administrative team meetings included Andrus, Madden, Sarmento, and Shelvock, among others. *Id.* At the meetings, the administration used a spreadsheet to compare employees' ages to their insurance premiums and use of the insurance. *Id*. at 24. Pendergrass testified that during the discussions, administrators made comments such as "we need to get rid of older people" and "we need to get people to retire." *Id*. at 19–22. While it was not always the focal point of discussion, the administration regularly expressed a desire to get rid of older employees due to the cost. *Id*. at 22–23. Pendergrass testified that Ramsey was one of the employees targeted in the meetings for her high health costs. *Id*. at 73–75, 79.

In addition to the administrative team meetings, Pendergrass attended meetings with Madden and Patricia Scott, the Business Office Manager. *Id*. at 39; Scott Dep. 25–26. Both Pendergrass and Scott testified they attended meetings with Madden in which the participants discussed the need to get rid of older employees because of their expensive health insurance. Pendergrass Dep. 39; Scott Dep. 25–26. Scott testified that one particular employee, a registration clerk in the emergency room, was targeted for retirement because she was "too old." Scott Dep. 17–27. Amaral told Scott to micromanage her and to report any error whatsoever that she made on her registrations, because she "[was] just too old and set in her ways, and she

9

1    need[ed] to retire." *Id.* at 18.  Madden also made several comments that the registration clerk was

2    too old and needed to retire, and Madden had employees direct error reports about the employee

3    to him.  *Id.* at 25–27.  Scott testified that on other occasions, Madden said a couple of members of

4    the engineering staff were "getting up there in years" and just "needed to think about retiring and

5    making room for younger people."  *Id.* at 30.  He made similar comments about staff in

6    housekeeping and the dietary department.  *Id.*

7    III.    LEGAL STANDARD

8            A court will grant summary judgment "if . . . there is no genuine dispute as to any

9    material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

10   The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

11   resolved only by a finder of fact because they may reasonably be resolved in favor of either

12   party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

13          Rule 56 also authorizes the granting summary judgment on part of a claim or

14   defense, known as partial summary judgment.  *See* Fed. R. Civ. P. 56(a) ("A party may move for

15   summary judgment, identifying each claim or defense—or the part of each claim or defense—on

16   which summary judgment is sought.").  The standard that applies to a motion for partial summary

17   judgment is the same as that which applies to a motion for summary judgment.  *See State of Cal.*

18   *ex rel. Cal. Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998)

19   (applying summary judgment standard to motion for summary adjudication); *ARC of Cal. v.*

20   *Douglas*, No. 11-02545, 2015 WL 631426, at *3 (E.D. Cal. Feb. 13, 2015).

21          The moving party bears the initial burden of showing the district court "that there

22   is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*,

23   477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party, which "must establish

24   that there is a genuine issue of material fact . . . ."  *Matsushita Elec. Indus. Co. v. Zenith Radio*

25   *Corp.*, 475 U.S. 574, 585 (1986).  In carrying their burdens, both parties must "cit[e] to particular

26   parts of materials in the record . . . ; or show [] that the materials cited do not establish the

27   absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

28   evidence to support the fact."  Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586

1   ("[The nonmoving party] must do more than simply show that there is some metaphysical doubt

2   as to the material facts.").  Moreover, "the requirement is that there be no *genuine* issue of

3   *material* fact . . . .  Only disputes over facts that might affect the outcome of the suit under the

4   governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at

5   247–48 (emphasis in original).

6          In deciding a motion for summary judgment, the court draws all inferences and

7   views all evidence in the light most favorable to the nonmoving party.  *Matsushita*, 475 U.S. at

8   587–88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).  "Where the record taken as a

9   whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

10  issue for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv.

11  Co.*, 391 U.S. 253, 289 (1968)).

12  IV.    DISCUSSION

13         A plaintiff can defeat a motion for summary judgment on a discrimination claim

14  either by producing direct evidence of discrimination, *see Enlow v. Salem-Keizer Yellow Cab Co.*,

15  389 F.3d 802, 812 (9th Cir. 2004), or by proceeding under the framework established in

16  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Because of the similarity between

17  state and federal employment discrimination laws, California courts look to federal decisions

18  when interpreting FEHA and have expressly adopted the burden-shifting test of *McDonnell*

19  *Douglas*.  *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 354 (2000); *see also Mamou v. Trendwest*

20  *Resorts, Inc.*, 165 Cal. App. 4th 686, 713–15 (2008).  Here, the court addresses plaintiff's FEHA

21  and ADEA claims jointly, because the applicable California and federal rules are functionally

22  equivalent for purposes of this order.  The court need not decide whether plaintiff's evidence

23  constitutes direct evidence of discrimination, because the court finds plaintiff has raised triable

24  issues of material fact under the *McDonnell Douglas* test.

25         Under the *McDonnell Douglas* framework, the plaintiff first has the burden of

26  proving a prima facie case of discrimination by a preponderance of the evidence.  *Texas Dep't of*

27  *Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981).  Second, if the plaintiff establishes a

28  prima facie case, the burden shifts to the defendant employer "to articulate some legitimate,

11

1  nondiscriminatory reason for the employee's rejection." *Id.* (quoting *McDonnell Douglas*, 411

2  U.S. at 802).  Third, if the defendant sustains this burden, "the plaintiff must then have an

3  opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the

4  defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 253.

5  When a defendant employer moves for summary judgment, the burden is reversed:

6  the defendant bears the burden to "show either that (1) plaintiff [can]not establish one of the

7  elements of [the discrimination] claim or (2) there [is] a legitimate, nondiscriminatory reason for

8  its [actions]." *Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 745 (9th Cir.

9  2011) (citation omitted).  "As a general matter, the plaintiff in an employment discrimination

10  action need produce very little evidence in order to overcome an employer's motion for summary

11  judgment." *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000).

12  This is because "the ultimate question is one that can only be resolved through a searching

13  inquiry—one that is most appropriately conducted by the factfinder, upon a full record."

14  *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996) (citations and internal

15  quotation marks omitted).

16  A.      Prima Facie Claim

17  To establish a prima facie case of discrimination, plaintiff must provide evidence

18  that (1) she was a member of a protected class; (2) she was performing competently in the

19  position she held; (3) she suffered an adverse employment action, such as termination; and

20  (4) some other circumstance suggests discriminatory motive.  *Guz*, 24 Cal. 4th at 355; *see also*

21  *Joaquin v. City of L.A.*, 202 Cal. App. 4th 1207, 1220 (2012).  The fourth factor can be

22  established by showing that plaintiff was "replaced by substantially younger employees with

23  equal or inferior qualifications," *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 891 (9th Cir. 1994)

24  (citation omitted), or by showing "that others not in her protected class were treated more

25  favorably," *Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir. 1994).  *See also Coleman v.*

26  *Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000).  Although there is no bright-line test

27  governing whether an employee is "substantially younger" under the fourth factor, courts have

28  found a ten-year age difference to be substantial.  *Brazill v. California Northstate Coll. of*

1    *Pharmacy, LLC*, 904 F. Supp. 2d 1047, 1053 (E.D. Cal. 2012) (citing *Diaz v. Eagle Produce Ltd.*

2    *P'ship*, 521 F.3d 1201, 1209 (9th Cir. 2008), and *Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 893

3    (7th Cir. 1997)).  The plaintiff's initial burden in establishing a prima facie case is to show that

4    the adverse action "is more likely than not" based on a prohibited discriminatory reason.  *Guz*, 24

5    Cal. 4th at 355.

6            Here, the parties dispute only whether plaintiff satisfies the second and fourth

7    elements.  The court agrees she falls within the applicable protected class and suffered an adverse

8    employment action, and therefore confines its discussion to those elements, plaintiff's job

9    performance and defendant's discriminatory motive.

10           1.    Job Performance

11           As to the second element, defendant argues plaintiff was not performing her job

12   satisfactorily for the same reason that allegedly prompted her termination: she violated Fairchild's

13   privacy policy and HIPAA notice.  Mem. P. &. A. at 10–11 (citing *Diaz*, 521 F.3d 1201, and

14   *Brokaw v. Saks Fifth Ave.*, No. 92-1477, 1993 WL 87815 (N.D. Cal. Mar. 16, 1993)).  In *Diaz*,

15   the Ninth Circuit held that no reasonable juror could find a certain employee's performance was

16   satisfactory when he openly violated a company policy over an extended period of time and

17   continued to do so even after receiving a warning.  521 F.3d at 1208.  However, the Ninth Circuit

18   found a triable issue of fact existed as to the performance of the other employees, who "generally

19   performed dependably" and whose deficiencies in performance "were relatively minor and

20   infrequent."  *Id.*  (describing the occurrence of four incidents over the course of four years as

21   being "relatively infrequent").  In *Brokaw*, the court found the plaintiff employee was not

22   performing her job satisfactorily because she "admittedly . . . and knowingly violated an express,

23   written policy regarding the discounting of merchandise."  1993 WL 87815, at *2.

24           Here, Ramsey worked at Fairchild as a nurse from 2000 to 2012, and as Employee

25   Health Nurse from early 2012 until her termination in March 2014.  To support its position that

26   Ramsey was not performing her job satisfactorily, defendant relies on the single incident with

27   patient Doe in 2014.  Plaintiff disputes the incident constituted a violation of HIPAA or

28   Fairchild's privacy policies.  She has submitted evidence suggesting she was involved in Doe's

1   medical care in her role as Fairchild's Employee Health Nurse and used his health information

2   solely with the goal of providing care to Doe, *see* SDF nos. 54–60, 62–69, 72; Ramsey Decl.

3   ¶¶ 2–4; Ramsey Dep. 163–66, 171–84, which is permitted under HIPAA and Fairchild's privacy

4   policies, *see* Madden Decl. ¶¶ 2, 3, 6, Ex. B; Madden Dep. 114; Ramsey Dep. 104–05; Sarmento

5   Decl. ¶ 3, Exs. A & B.  In addition, plaintiff has submitted deposition testimony of a designated

6   expert witness, Christine Jones, concluding that Ramsey's conduct did not violate HIPAA.[3]  SDF

7   nos. 93 & 94; Jones Dep. 90, 92–93, 103–04, 119, 122–24, 127–28.  It is not clear as a matter of

8   law that Ramsey's conduct violated HIPAA or Fairchild's privacy policies, or otherwise rendered

9   her job performance unsatisfactory.  Accordingly, the incident with patient Doe in 2014 is

10  distinguishable from the open and extended policy violations of the employee in *Diaz,* and the

11  admitted, knowing policy violation of the plaintiff employee in *Brokaw.*

12          Moreover, Ramsey has submitted other evidence showing she was performing her

13  job well at the time of her termination.  In Ramsey's annual evaluation in late 2014, she received

14  the highest possible score in all categories related to patient privacy rights and HIPAA

15  compliance, received an overall score in the second highest "commendable range," and received

16  comments that she "continue[d] to perform the Employee Health Nurse role extremely well and

17  ha[d] been able to complete employee test requirements in a timely manner."  Howell Dep. 32.

18  Plaintiff has raised a triable fact as to whether she was performing her job satisfactorily.

19

20

21          [3] Defendant objects to this evidence as improper expert testimony under Federal Rule of
22  Evidence 702, because Jones has not served as a HIPAA compliance or security officer and made
    certain factual mistakes in her notes and testimony, such as incorrectly referring to "HIPAA" as
23  "HIPPA" or the "Health Information Privacy Act."  *See* Reply at 8–9, ECF No. 37 (citing *Kumho
    Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)); ECF No. 36 at 35–38.  Plaintiff's Designation
24  of Jones as an Expert Witness states Jones has been a healthcare professional for over thirty years,
    has served as the CEO of a hospital for the past fifteen years, has participated in annual HIPAA
25  compliance trainings, and has provided HIPAA services to healthcare providers.  ECF No. 16 at
    3; *see also* ECF No. 34-1 at 3.  Because it appears Jones' testimony may be admissible at trial,
26  and it is being offered by the non-moving party, the court overrules defendant's objection for
27  purposes of its motion for summary judgment without prejudice to renewal of the objection at
    trial.

28

1           2.     Discriminatory Motive

2           As to the fourth element, defendant argues plaintiff cannot cite evidence of any

3 indicia of age discrimination, for example, that her replacement was substantially younger and

4 had equal or lesser qualifications. Mem. P. &. A. at 11–14. Defendant notes plaintiff's

5 replacement, Amaral, had a combined twenty-four years of management experience at Fairchild

6 and was not placed in the position until almost three months after Ramsey's termination. *Id.* at

7 11. The court agrees that plaintiff has not submitted evidence showing she was replaced by a

8 substantially younger employee with equal or inferior qualifications. Although Amaral is more

9 than thirteen years younger than Ramsey, which constitutes a substantial age difference, the only

10 evidence plaintiff has submitted to establish Amaral was less qualified is Ramsey's own

11 unsupported opinion. *See* SDF no. 33 (citing Ramsey Decl. ¶ 6).

12           However, plaintiff has produced other evidence of defendant's discriminatory

13 motive. She has submitted testimony by two former Fairchild administrators, Pendergrass and

14 Scott, that they attended meetings in which the Hospital's administration discussed the need to get

15 rid of older employees. Pendergrass Dep. 19–23, 39; Scott Dep. 17–27. Pendergrass testified

16 that at the weekly administrative leadership team meetings, administration representatives

17 regularly expressed a desire to get rid of older employees due to the cost. Pendergrass Dep. 22–

18 23. Pendergrass further testified that the Hospital targeted Ramsey. *Id.* at 73–75, 79. Scott

19 directed by Amaral and Madden to micromanage one particular employee because that employee

20 was "too old" and needed to retire. Scott Dep. 17–27. This evidence more than satisfies the

21 "minimal" degree of proof necessary to "give[] rise to an inference of unlawful discrimination."

22 *Wallis*, 26 F.3d at 889 (citations omitted).

23       B.     Non-Discriminatory Reason

24           Because plaintiff has established a prima facie case of age discrimination for

25 purposes of summary judgment, the burden shifts to the employer to rebut the presumption with

26 admissible evidence of a "legitimate, non-discriminatory reason" for the action. *Texas Dep't of*

27 *Cmty. Affairs*, 450 U.S. at 253; *Guz*, 24 Cal. 4th at 355–56. Again, Fairchild argues it terminated

28 plaintiff because it believed she violated its HIPAA and privacy policies. This reason is unrelated

1   to prohibited bias and, if true, would constitute a legitimate, non-discriminatory reason for

2   termination.  *Cf. Dumas v. New United Motor Mfg., Inc.*, 305 F. App'x 445, 448 (9th Cir. 2008)

3   (unpublished) (holding violation of company policy requiring written permission for extended

4   leaves of absence constitutes legitimate, non-discriminatory reason for termination); *Schaldach v.*

5   *Dignity Health*, No. 12-02492, 2015 WL 5896023, at *4 (E.D. Cal. Oct. 6, 2015) (holding

6   plaintiff's repeated violations of company's HIPAA and network usage policies, if true, would

7   preclude a finding of discrimination).  Plaintiff acknowledges defendant's proffered reason is, on

8   its face, a non-discriminatory reason.  Opp'n at 16.

9           C.     Pretext

10          Because defendant has provided a legitimate, non-discriminatory reason for the

11  termination, the burden shifts back to plaintiff to show that explanation is pretext.  *Texas Dep't*,

12  450 U.S. at 253; *Guz*, 24 Cal. 4th at 356.  Pretext can be shown "(1) directly, by showing that

13  unlawful discrimination more likely than not motivated the employer; or (2) indirectly, by

14  showing that the employer's proffered explanation is unworthy of credence because it is

15  internally inconsistent or otherwise not believable."  *Earl v. Nielsen Media Research, Inc.*, 658

16  F.3d 1108, 1112–13 (9th Cir. 2011) (citing *Chuang*, 225 F.3d at 1127).

17          To argue pretext with reliance on indirect evidence, plaintiff "must produce

18  'specific' and 'substantial' facts to create a triable issue . . . ."  *Earl*, 658 F.3d at 1113 (quoting

19  *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998)).  *But see Cornwell v. Electra*

20  *Cent. Credit Union*, 439 F.3d 1018, 1029–31 (9th Cir. 2006) (questioning the continued viability

21  of *Godwin* after *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)).  "An employee in this

22  situation can not [sic] simply show the employer's decision was wrong, mistaken or unwise."

23  *Morgan v. Regents of the Univ. of Cal.*, 88 Cal. App. 4th 52, 75 (2000) (citation and internal

24  quotation marks omitted).  "Rather, the employee must demonstrate such weaknesses,

25  implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered

26  legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy

27  of credence . . . ."  *Id.* (citation, emphasis, and internal quotation marks omitted).  In contrast, if

28  plaintiff offers direct evidence of discriminatory motive, she can show there is a triable issue as to

16

1    the actual motivation of Fairchild, even if the evidence is "very little." *Godwin*, 150 F.3d at 1221

2    (citation omitted).  "Direct evidence is evidence which, if believed, proves the fact [of

3    discriminatory animus] without inference or presumption." *Id.* (citation omitted) (alteration in

4    original).

5            Here, plaintiff has raised triable issues as to pretext both through direct and

6    indirect evidence.  Much of the evidence discussed above with respect to plaintiff's prima facie

7    case also supports a finding of pretext.  The deposition testimony of Scott and Pendergrass,

8    Pendergrass Dep. 19–23, 39; Scott Dep. 17–27, if believed, directly proves that at least Madden

9    exhibited discriminatory animus in connection with employment decisionmaking.  *See Brazill v.*

10   *Cal. Northstate Coll. of Pharmacy, LLC*, 949 F. Supp. 2d 1011, 1022–23 (E.D. Cal. 2013)

11   (finding similar comments, although not directly tied to the plaintiff's termination, "constitute[d]

12   unambiguous evidence of discriminatory animus connected to employment decisionmaking," and

13   were therefore sufficient to create a triable issue as to pretext).  Significantly, Madden conducted

14   the investigation into Ramsey's conduct and was involved in the decision to terminate her.  *See*

15   Madden Decl. ¶¶ 5–6, Exs. E & F; Madden Dep. 56–59, 92.

16           In addition, plaintiff has produced facts that undermine Fairchild's proffered

17   reason for terminating Ramsey.  As discussed above, Ramsey has offered evidence that her

18   conduct did not violate HIPAA or Fairchild's privacy policies.  *See* SDF nos. 54–60, 62–69, 72;

19   Ramsey Decl. ¶¶ 2–4; Ramsey Dep. 163–66, 171–84.  Madden acknowledged that Ramsey, in her

20   position as Employee Health Nurse, had the authority to access employee health records if they

21   were relevant to her work, Madden Dep. 114, but he never asked her why she looked at Doe's test

22   results, Ramsey Dep. 187–88.  In fact, Madden did not speak with Ramsey at all about the

23   incident before the administration decided to terminate her employment, even though Madden

24   testified he "always" talks to the subject employee before preparing a write up.  Madden Dep. 64–

25   66, 132.  Madden's two-day investigation consisted solely of interviewing Fairchild's Business

26   Office Manager, speaking with patient Doe, and reviewing Ramsey's computer access.  *Id.* at 31–

27   38.  Moreover, Madden never investigated why the lab results were sent to Ramsey's office or

28   why there was cursive writing on the lab results routing the test results to Infection Control.  *Id.* at

17

1    51–55.  This evidence, viewed in the light most favorable to Ramsey, raises triable disputes as to

2    whether Fairchild's proffered HIPAA justification is pretext for age discrimination.

3               The granting of summary judgment in *Schaldach*, 2015 WL 5896023, does not

4    alter the court's conclusion.  In *Schaldach*, the district court found the plaintiff employee could

5    not survive summary judgment solely by contesting whether her conduct in fact violated HIPAA,

6    because she was terminated for violating defendant's policies, not HIPAA, and because the

7    relevant question was whether the employer honestly believed the employee violated the policies,

8    not whether the employee in fact violated the policies.  *Id.* at *4.  *Schaldach* is distinguishable

9    from this case because Ramsey was told she was terminated for violating HIPAA, Ramsey Dep.

10   187–88, and unlike the employee in *Schaldach*, Ramsey has submitted other evidence of pretext.

11   The evidence that her conduct did not in fact violate HIPAA, together with the evidence of the

12   administration's discriminatory animus and the defects in Madden's investigation, raises a

13   genuine dispute as to whether Fairchild honestly believed Ramsey violated HIPAA, or whether

14   Fairchild's proffered reason was pretext.

15              Neither is the court persuaded by defendant's citation to *Hazen Paper Co. v.*

16   *Biggins*, 507 U.S. 604 (1993).  In *Hazen*, the Supreme Court held that "an employer does not

17   violate the ADEA just by interfering with an older employee's pension benefits that would have

18   vested by virtue of the employee's years of service."  *Id.* at 613.  The Court in *Hazen* emphasized

19   the narrow scope of its holding and left open the possibility that pension status may in some cases

20   be a proxy for age, that a termination decision may be motivated both by the employee's age and

21   pension status, and that the outcome may differ where the vesting of pension benefits is

22   determined by the employee's age, rather than the employee's years of service.  *Id.*  *Hazen* is not

23   applicable here, where plaintiff has submitted evidence of discrimination based on employees'

24   age, such as statements by administrators that certain employees are "too old" and needed to

25   leave to make room for younger people, in addition to evidence of discrimination based on

26   employees' health care costs.  *See, e.g.*, Scott Dep. 30.

27

28

1    In sum, Ramsey has produced sufficient evidence to establish a prima facie case of

2  age discrimination and has raised a triable dispute as to whether Fairchild's proffered HIPAA

3  justification for terminating Ramsey was pretext.

4  V.    <u>CONCLUSION</u>

5    For the foregoing reasons, the court DENIES defendant's motion for summary

6  judgment or, alternatively, partial summary judgment.

7    Plaintiff is hereby ORDERED to show cause in the parties' forthcoming joint

8  pretrial statement why the court should not dismiss the "Doe" defendants.

9    IT IS SO ORDERED.

10  DATED:  June 8, 2016.

11

12  _____

13  UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28